**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

**JONATHAN LEWIS GRIFFIN, Individually and as
Personal Representative on Behalf of the
Wrongful Death Beneficiaries of
KENDRICK LANELL WALKER**                                                    **PLAINTIFF**

**v.**                                                    **CIVIL ACTION NO. 5:14-cv-98-DCB-MTP**

**MANAGEMENT & TRAINING CORPORATION
and JOHN AND JANE DOES 1-100**                                                    **DEFENDANTS**

**PLAINTIFFS' MEMORANDUM BRIEF IN SUPPORT OF RESPONSE TO
DEFENDANT, MANAGEMENT & TRAINING CORPORATION'S MOTION FOR
SUMMARY JUDGMENT**

**Introduction**

This lawsuit is brought by Jonathan Lewis Griffin, Kendrick Walker's brother, on behalf of himself and the other wrongful death beneficiaries ("Plaintiffs" herein) against Defendant, Management & Training Corporation (hereinafter, "MTC"). MTC's actions and inactions created the "atmosphere of deliberate indifference" which led to Kendrick being stabbed eighty-one (81) times. MTC's claim that "it did everything it could" to prevent Kendrick's death is disputed by the facts, Plaintiffs' expert and the admissions of Defendant's expert. For the reasons set forth below, MTC's motion for summary judgment must be denied.

MTC's "Statement of Facts" is a little over two (2) pages long. The facts correctly set forth the time line of events which occurred on May 25, 2014. *See* MTC's Memorandum Brief, p. 2. However, MTC omits what happened to Kendrick, and why. MTC did not want to discuss the facts because they reveal a prison where the staff is inadequately staffed, managed, and trained. The prison is inadequate for even *housing* the type of prisoners incarcerated there at the time of Kendrick's death. MTC was aware of these problems prior to Kendrick's death but turned a "blind eye" to them. A closer look at the facts demonstrates why MTC is liable for Kendrick's death.

**Facts**

On May 25, 2014, Kendrick Walker, an inmate incarcerated at the Wilkinson County Correctional Facility ("WCCF"), was stabbed eighty-one (81) times and died. The entire episode was captured on surveillance video and speaks for itself. The surveillance video is attached as Ex. A.

Kendrick was housed in "F" Pod on May 25, 2014. "F" Pod is separated from "G" Pod by a control tower. The officer assigned to the control tower can observe both "F" and "G" Pods. MTC employees Nadia Letcher, Sharon Amos, and Charlis Dukes, all female, were the correctional officers on duty that day. Letcher was the floor officer on "G" Pod, Dukes was the floor officer on "F" Pod and Amos was assigned to the control tower. Ex. B, Letcher deposition p. 30-31, 54. At the time Kendrick was stabbed all three (3) ladies were inside the control tower.

Letcher, Amos, and Dukes had all been employed for less than a year. Ex. B, p. 9-10 (hired July, 2013); Ex. C, Amos' personnel file (hired July, 2013); Ex. D, Dukes' personnel file (hired Feb. 10, 2014). None of them had prior experience as a correctional officer. *See* Ex. B, p. 9; Ex. C; Ex. D. Letcher testified that she felt that MTC needed more than just one (1) floor officer for safety reasons. Ex. B, p. 35.

The assault on Kendrick started at approximately 12:21 p.m. Kendrick was able to jump from the shower area to the second floor and lock himself inside cell 201. He remained in this cell for approximately twelve (12) minutes. During this twelve (12) minute time period no MTC employee attempted to help him. Inmates continued to stay in control of "F" Pod. The video shows inmates approach the guard tower and point to cell 201. Letcher testified that the inmates were asking the guards to open cell 201. Ex. B, p. 55. Letcher, Amos and Dukes denied opening

the cell door. Ex. E, Mississippi Department of Corrections ("MDOC") Criminal Investigation Division ("CID") Report, p. 11.[1]

This is an area of contention which MTC glosses over. The CID Report reveals that two (2) of the guards who were in the control tower, Amos and Dukes, were both "gang affiliated" and had been bringing in contraband to inmates for months. Ex. E, p. 11. Both Amos and Dukes provided statements acknowledging their misconduct and were subsequently fired. Ex. E, p. 35; Ex. C; Ex. D. The CID Report also reported that several inmates heard the cell door "pop" or "buzz", indicating that one (1) of the guards in the control tower actually opened the cell door. Ex. E, p. 8-10.

CID investigators could not conclusively confirm that the MTC employees were complicit in opening the door, either intentionally, negligently, or with gross negligence due to the conflicting evidence. Ex. E, p. 14. However, a jury question clearly exists as to whether the MTC employees acted improperly and whether MTC supervisors were aware, or should have been aware, of the fact that these employees were gang affiliated, and improperly trained or supervised.

With the cell door unlocked, Kendrick was drug out of the cell by numerous inmates who were kicking, beating, and stabbing him. One (1) inmate even dropped a microwave on him. MTC's employees stood by and watched. When Kendrick finally lay on the ground, motionless, one (1) inmate urinated on him. Ex. E, p. 3.

Eventually, Corrections Emergency Response Team ("CERT") members Major Gabriel Walker and Captain Jamie Brown entered "F" Pod at 12:47. The inmates quickly dispersed as Capt. Brown was armed with a 37-millimeter pepper gun. After checking on Kendrick, both

---

[1] The CID Report is admissible under *F.R.E.* 803(8)(c). *See Shepherd v. Dallas County,* 591 F. 3d 445 (5th Cir. 2001).

men left. Ex. A. The CID Report notes that inmates got back out of the cells and cleaned up the crime scene. Ex. E, p. 3. When the CERT members returned, inmate Mike Powell refused to return to his cell and remained in the shower for five (5) minutes. Powell was one of the main attackers and was apparently cleaning up blood. The video shows that he calmly dresses in front of Major Walker. The CID Report notes that Powell refused to be handcuffed and walked out of the Pod unrestrained. Once outside, Powell can be seen telling Major Walker that he does not want to be handcuffed behind his back; Major Walker agrees to his demand. Ex. E, p. 14. The CID Report noted that this was a violation of policy. *Id.* Plaintiffs submit that Major Walker's actions were simply "business as usual" at WCCF- the prisoners ran the prison. *Id.*

MTC is a private company which manages private prisons in various states. MTC took over operations at WCCF in July, 2013. The facility had previously been operated by Corrections Corporation of America. MTC also operates three (3) other facilities in Mississippi: Marshall County Correctional Facility, Walnut Grove Correctional Facility and East Mississippi Correctional Facility. Ex. F, MTC corporate designee Marjorie Brown deposition, p. 8, 14.

When MTC assumed control of WCCF it was aware of the myriad of problems in existence. The inmate population was approximately eight hundred fifty (850) at any given time. Ex. E, p. 17. Of those eight hundred fifty (850) inmates, ninety percent (90%) were "close custody" or "C custody" inmates. "Close custody" inmates are considered to be the "most dangerous" in Mississippi's prison system. To make matters worse, most of the inmates were also gang members. Approximately six hundred eighty (680) of eight hundred fifty (850) inmates were gang members at any given time. Ex. F, p. 38.

The Gangster Disciples and Vice Lords make up the biggest gang population in Mississippi prisons, including at WCCF. MTC officials are aware of the violent history and "bad blood" not only between these two (2) groups, but among gang members in general from its

operation of other facilities and through its "due diligence" when it took over WCCF. Ex. F, p. 46-47.

Contraband flows freely at MTC. Contraband can take many forms, and includes anything not issued by the facility; the most common forms include weapons, tobacco, drugs, alcohol and cell phones. These items are the "currency" of any prison and the gangs seek to control this currency. MTC correctional officers often helped bring in contraband for the inmates. In fact, former MTC Captain Jamie Brown testified that gang members at WCCF recruited female guards to apply for jobs at the prison so that they could bring in contraband. Captain Brown stated that MTC officials were aware of this fact prior to Kendrick's death. Monthly MDOC Compliance Reports reveal a vast array of contraband which is confiscated on a monthly basis. Of particular note are the weapons which are confiscated. Ex. G, Bates No. MTC000974-984. MTC correctional officers have confiscated homemade knives as big as "swords". Ex. H, Jamie Brown deposition, p. 21-22. Captain Brown testified he personally collected twenty-two (22) of these "swords". *Id.* at 22. Despite shakedowns, the contraband is replenished the next day like a "revolving door". *Id.* at 21.

WCCF's volatile prison population had already seen its share of violence prior to MTC assuming control. MTC officials were also aware of these violent uprisings, which included gang riots and inmate deaths. Ex. F, p. 45-46. At least two (2) of MTC's supervisors, Major Gabriel Walker and Captain Ella Scott, worked at MTC when these events occurred. Ex. I, Major Walker's deposition, p. 11; Ex. J, Captain Ella Scott's deposition, p. 4, 8-9. Captain Scott was a witness in the 2012 death of inmate Demond Flowers. That case was filed and settled in this court. Ex. J, p. 4. *See Janice Flowers, et al. v. Corrections Corporation of America, et al.;* In the United States District Court for the Southern District of Mississippi; Western Division; Civil Action No. 5:13-cv-122-DCB-MTP.

MTC was also aware of the "physical plant" problems within the prison prior to assuming control. For instance, the cell doors throughout the facility are capable of being opened by the inmates. Ex. F, p. 61-62. MTC officials have long been aware that inmates can open their cell doors from the inside and come and go freely. Ex. K, Warden Frank Shaw deposition, p. 76. MTC officials have turned a "blind eye" to this problem since taking over the facility.

After this litigation was commenced, the Plaintiffs informed MTC's attorneys that inmates were free to "come and go" from their prison cells at night. MDOC policy dictates that all prisoners are to be "locked down" in their cells at night. MTC allegedly adheres to this policy. In order to demonstrate MTC was ignoring this practice, the Plaintiffs requested random surveillance nightly video. MTC produced the video which is from May 12, 2015 to May 19, 2015. The surveillance video is attached as composite Ex. L.

The surveillance video reveals disturbing footage. Inmates do freely "come and go" at all hours of the night. MTC correctional officers are nowhere to be seen despite having a duty to return the prisoners to their cells or notify supervisors if they refuse to return to their cells. Ex. K, p. 82. MTC officials were aware of this problem and that it existed prior to Kendrick Walker's death. Ex. F, p. 61-62; Ex. K, p. 86-87. MTC officials were shown the surveillance video and agreed that it was "concerning" and a violation of "policy and procedure". Ex. F, p. 140-141; Ex. K, p. 79. However, there was no evidence that MTC disciplined any officer or inmate for these violations. Instead, by doing nothing MTC condoned their actions.

In rebuttal, MTC may contend that the surveillance video from May 2015 is inadmissible since it came out after the May 25, 2014 killing. However, subsequent events can be admissible and relevant in §1983 cases. In *Grandstaff v. City of Boyer, Texas,* 767 F.2d 161 (5th Cir. 1985), the 5th Circuit wrote the following about subsequent conduct in § 1983 cases:

> [a]s subsequent conduct may prove discriminatory motive in a
> prior employment decision, [cite omitted], and subsequent acts
> may tend to prove the motive of a prior conspiracy, [cite omitted],
> so the subsequent acceptance of dangerous recklessness by the
> policymaker tends to prove his pre-existing disposition and policy.

*Id.* at 171.

*See also Beck v. City of Pittsburg,* 89 F.3d 966 (3ʳᵈ. Cir. 1996) (Excessive force complaint filed after the Plaintiff's incident "may have evidentiary value for a jury's consideration whether the City and policy makers had a pattern of tacitly approving the use of excessive force."); *Foley v. City of Lowell, Mass.,* 948 F.2d 10, 14 ("actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident." Citing *Bordano v. McCleod,* 871 F.2d 1151 (1ˢᵗ Cir. 1989)).

Warden Shaw explained that the locks were easily compromised because the prison was not designed to be used for a "C Custody" facility. WCCF was originally designed as a medium and minimum custody facility. Ex. K, p. 82. Warden Shaw acknowledged that putting "C Custody" offenders in WCCF was a problem before MTC took over. Ex. K, p. 82. Warden Shaw stated that "the locks just needed to be changed out… and/or the inmate population needed to be changed". Ex. K, p. 86. This was a problem about which MTC was aware before taking over. *Id.*

MTC designated Stephen Huffman as its prison expert witness. However, MTC did not mention Mr. Huffman's opinions or even his name in its Motion. This is hardly surprising, given the fact that Mr. Huffman was highly critical of MTC during his deposition. Mr. Huffman stated that WCCF had an inmate population of approximately nine hundred fifty (950), and seventy percent (70%) of those inmates were gang affiliated. Ex. M, Huffman deposition, p. 27. WCCF had a "high rate of staff turnover and a volatile culture due to previous disturbances resulting in the death of an inmate." Ex. M, p. 27. Regarding the cell door issue, Mr. Huffman agreed that

considering the inmate population at WCCF, it was important to be able to securely lock the inmates in their cells to ensure the security of staff and other inmates. Huffman testified that when you allow inmates out of their cells at unauthorized times "you're telling them… they can break the rules, and if you allow them to break that rule, they can break another rule." Ex. M, p. 57. Mr. Huffman also testified that "[i]f you're not going to enforce [the rule], then you're telling the staff that I guess it's not worth enforcing if you continue to allow it." *Id.* at 58. Mr. Huffman was forced to concede that allowing the inmates to roam free was "not acceptable correctional practice" since it jeopardized the security of the prison. Mr. Huffman was also critical of Warden Frank Shaw, who admitted to being aware of this activity to continue:

> To allow it to continue without any procedures in place to correct it, and by that I mean making sure that your supervisors are making rounds to make sure it's not happening, is not acceptable.

*Id.* at 58.

Mr. Huffman testified that he saw nothing which showed that MTC disciplined staff or the inmates for this behavior. *Id.* at 59, 63. Mr. Huffman stated that he would not allow such behavior to exist in a prison he operated. *Id.* at 59.

Mr. Huffman was also critical of MTC's conduct during the assault on Kendrick. Mr. Huffman testified that a prison must always have enough staff on duty to handle emergency situations like the situation in this case, even on holidays or weekends. *Id.* at 28. Mr. Huffman testified that this staff must be adequately trained. *Id.* at 29. Mr. Huffman was aware that MTC had an "emergency response" plan which required MTC to have enough staff on duty who were trained on the proper equipment which could quell a disturbance like the one in the case at bar. *Id.* at 96-98. MTC's emergency plan, which was discussed in Mr. Huffman's deposition, is attached as Ex. N.

*Mr. Huffman agreed that MTC did not have the adequate number of staff on duty to help Mr. Walker, nor did MTC properly train the staff which was on duty that day*.  Ex. M, p. 104, 107.  MTC had three (3) employees who initially responded to the fight and which were members of the "quick response" or "Emergency Response Team" (ERT).  MTC policy and procedures require that ERT members be trained on the 37 mm weapon and the pepper ball gun.  Ex. M, p. 102; Ex. N.  The 37-mm weapon is a like a shotgun and shoots up to sixty (60) to seventy (70) yards.  Ex. I, p. 27, 47.  However, none of the individuals on staff that day were trained to use the 37-mm weapon or pepper ball gun; MTC concedes this fact.  MTC's Memorandum Brief, p. 4.

Mr. Huffman acknowledged that Kendrick Walker was initially stabbed by inmates but made it to cell 201 where he remained for eleven (11) to twelve (12) minutes.  Ex. M, p. 107-108. According to Mr. Huffman's expert opinion, there was enough time for MTC officials to introduce OC spray into "F" Pod, but this was not done.  *Id.* at 108.  Mr. Huffman acknowledged that even though MTC policy and procedure authorized the use of OC spray, MTC "didn't have the equipment down there and nobody was trained on the equipment, -- that's definitely a mistake by the facility of not having somebody trained, and what I mean is on the 37 millimeter or any of the other equipment that they would use to go in once those [OC] grenades were dropped into the unit.  And so at that point, you can't say that everything had been done because they didn't have everything in place in order to do it."  *Id.* at 111.  Mr. Huffman agreed that MTC should have had someone at the facility at all times who was trained to use the 37-millimeter or pepper ball gun.  *Id.* at 111-112.  Mr. Huffman conceded that it was a failure on MTC's part to not have someone on staff who was so certified.  *Id*. at 112, 118.  Mr. Huffman did not know why MTC failed to have a correctional officer on duty who was certified to utilize

these weapons. *Id.* at 118. Mr. Huffman agreed that MTC's twenty-five (25) minute response time was not reasonable. *Id.* at 115.

Mr. Huffman conceded that MTC did not follow their own polices and procedures with regard to an emergency procedure. *Id.* at 120. Mr. Huffman agreed that if MTC had the appropriate number of staff who were adequately trained at the time Kendrick Walker was locked in the cell for eleven (11) to twelve (12) minutes, they would have been able to disperse the other inmates. *Id.* at 120-121.

The 37-millimeter is a very effective tool for dispersing a crowd. *Id.* at 120. Capt. Brown and Gabriel Walker were the first CERT members who arrived. Capt. Brown was armed with a 37-millimeter pepper launcher. The inmates quickly dispersed when they saw him. Ex. I, p. 30-31; Ex. H, p. 31-32. Kendrick Walker was either dead by then, or critically wounded. Ex. I, p. 28.

MTC claims it did all it could do to help Kendrick Walker, but their own expert refuted this position. Additionally, the surveillance video of the attack disputes this as well. The surveillance video, including the staff's reactions, or lack thereof, while watching from the Sally Port area, can be seen on Ex. A.

Richard Subia was designated as the Plaintiffs' expert in prison policies and procedures. Mr. Subia submitted two (2) expert opinions, an original and supplemental, which are attached as Exs. O and P. MTC does mention Mr. Subia in its motion, but makes no attempt to discredit his opinions. This may have to do with the fact that Mr. Subia essentially agreed with MTC's own expert on numerous, salient points.

Mr. Subia testified that MTC violated their duty to provide a safe and secure prison by allowing the cell door issue to exist. Ex. Q, Subia deposition, p. 56-57. Mr. Subia condemned MTC's slow response time, inadequate staffing, and inadequate training. Mr. Subia also stated

that MTC's "culture of deliberate indifference" led to Kendrick's death. Mr. Subia explained MTC was "acting in a way that put the inmates housed in that facility in jeopardy … in a way that led to or could have led to the compromising of their safety and/or security, and that those actions were done with purpose." *Id.* at 68-69.

The "rank and file" correctional officers acknowledged the myriad of problems which existed at WCCF. Every officer deposed acknowledged the problems with the cell doors and the security risks that this posed for the inmates and the staff. Ex. H, p. 20 (cell door issues were like a "revolving door"); Ex. I, p. 33 (ongoing problem which started in 2005); Ex. J, p. 59; Ex. B, p. 59-60; Ex. R, Virgil Rigdon deposition, p. 14-15 ("fighting a losing battle"). The officers also confirmed the contraband issues. Ex. H, p. 18-19; Ex. I, p. 8-9; Ex. B, p. 68; Ex. R, p. 13-14.

MTC experienced high turnover rates among the correctional officers and had a hard time employing an adequate number. Ex. J, p. 19-21 ("staffing has been a concern"). At the time Kendrick Walker was killed, MTC only employed one hundred ten (110) correctional officers when they were required to have one hundred fifty (150). Ex. F, p. 66. As a result, employees had to put in overtime to cover other shifts. Ex. F, p. 67. Plaintiffs' expert noted in both his original report and in his deposition that working overtime leads to "bad morale" among correctional officers and contributes to a "lack of attentiveness on the job due to job burnout." Ex. Q., p. 72-73. Indeed, MTC staff was shown to have issues with morale in the MDOC monthly report. Ex. G, No. MTC000974.

Of those one hundred ten (110) correctional officers, one hundred (100) were female. On the date Kendrick Walker was killed, all three (3) correctional officers on duty at the "F" Pod were female. Mr. Subia noted that the high ratio of female to male correctional officers made it difficult to conduct pat downs to search for contraband, as well as secure the overall security of

the facility. Ex. Q, p. 74-76. Mr. Subia opined that the high number of female jailers contributed to Kendrick's death. *Id.* at 76. Defense expert Mr. Huffman agreed this was a high number of females as well, and indicated the prisons in which he worked would typically employ twenty-five to thirty percent (25-30%). Ex. M, p. 33. Correctional officer Nadia Letcher testified that she did not want to be out on "F" Pod by herself. Ex. B, p. 32. She described it as feeling "overpowered" and that she had expressed these concerns to her supervisors. She felt more officers were needed out on the floor. *Id.* at 32-34.

In its memorandum brief, MTC stated that the fight was caused because of Kendrick's own behavior toward other inmates. P. 2. Kendrick was able to convince a guard to give him an extra lunch plate that day. This meant that one (1) of the other inmates would have to wait a little longer for lunch. Ex. E, p. 2; Ex. K, p. 60. This was typical behavior for Kendrick. Major Walker described Kendrick as a "good person" who could not "get right". Major Walker said Kendrick was not violent, but hardheaded and always irritating the other inmates. Ex. I, p. 16-18. Major Gabriel Walker testified that at the time of his death Kendrick was scheduled to be transferred. *Id.* at 69. Major Walker stated, "He wasn't disruptive towards staff. Due to his behavior, disciplinary record and you know, having to move him from unit to unit for stealing, protecting him, pretty much, moving him from this unit because, you know, you got caught stealing. ***Well, he's going to get himself jumped on, he's going to get beat up, so get him from over here…. Then we decided that, look, we need to get him out of here."*** Ex. I, p. 69-70 (emphasis supplied). On follow up questioning, Major Walker confirmed that Kendrick had to be moved for his own safety. *Id.* at 73. "[H]e wasn't suitable to be in a closed custody facility." *Id.* at 74. Warden Shaw also acknowledged that Kendrick was being moved. Ex. K, p. 58. "I knew Mr. Walker very well… He always had issues. All the other inmates always had issues with him. It was always a constant problem. And I felt like it would be better for him to remove

him from the facility at that time." Warden Shaw had put in a request to move Kendrick. Ex. K, p. 66. When asked specifically about whether Kendrick was in danger, Warden Shaw had this to say:

> Q: Did you think [Kendrick's actions] created an issue of him being in danger from other inmates?
>
> A: It could create an issue of him being in danger. It could create an issue of a disturbance happening in the facility.
>
> Q: Both of which happened on May 25, 2014?
>
> A: Correct.

*Id.* at 61.

MTC's corporate designee acknowledged Kendrick was a "problem child" who angered other inmates. Ex. F, p. 147. MTC officials never took any steps to place Kendrick in "protective custody" area despite having this knowledge. Ex. K, p. 62-63. MTC's expert, Mr. Huffman, also acknowledged the issue with Kendrick and the fact that Warden Shaw had the ability to put him in protective custody, but did not. Ex. M, p. 126.

During the eleven (11) minute time period in which Kendrick was locked in cell 201, MTC claims it made every effort to help him. The only thing MTC can point to is Deputy Warden Jackson ordering Lt. Virgil Rigdon to the roof to drop an OC grenade. MTC's Memorandum, p. 13. However, a review of the entire sequence of events reveals the utter incompetence of MTC officials.

Deputy Warden Jackson was asked about ordering Lt. Rigdon to the roof:

> Q: And specifically, did you tell him to go to the roof and drop the OC spray?
>
> A: I can't recall. I remember telling him to go to the roof.
>
> Q: Do you know if you told him to await your word to drop the spray?

A: I can't remember.

Q: Did you ever give him the word to drop OC spray?

A: I can't remember. It was all happening so fast. I can't recall.

Ex. S, Deputy Warden Jackson deposition, p. 58.

Jackson was asked about the OC spray itself:

Q: What does it do?

A: I'm not sure what it does. I haven't been through the training of that.

Ex. S, p. 64.

Q: Do you know why you wouldn't have ordered the OC spray to be dropped?

A: I can't remember at this time.

Ex. S, p. 65.

MTC's counsel attempted to show that it would have been impossible for Rigdon to get to the roof in enough time. Jackson was not aware of how long it would take for someone to get to the roof. Ex. S, p. 83-84.

Warden Shaw was more specific and wrong than Jackson. Warden Shaw testified that it would have been "physically impossible" for Rigdon or anyone else to get to the roof during the eleven (11) minute time period in which Kendrick was locked in the cell. Ex. K, p. 50-51. Warden Shaw testified it would take fifteen (15) to twenty-five (25) minutes to get to the roof. Ex. K, p. 51. Rigdon either is supernatural, or defied the laws of physics, because he testified that he it took him ***three (3) minutes*** to get to the roof. Ex. R, p. 20-21. He waited for someone to give the order to drop the OC grenade but the order never came. *Id.* at 21-22.

In sum, on the date Kendrick was killed MTC's acting warden could not remember if she told Rigdon to drop OC spray and does not know what OC spray does because she has not been

through the training. Warden Shaw was under the impression that dropping OC spray from the roof would not have helped because it would have been "physically impossible" to get to the roof in enough time to help Kendrick. Yet the man who went to the roof said it only took him three (3) minutes but no one ordered him to drop the OC grenade. Somehow MTC contends it did "everything it could under the circumstances" to help Kendrick.

The Plaintiffs will briefly address an argument MTC may use in rebuttal about the OC grenades. MTC attempted to bring out in depositions that use of the OC grenades would have been futile because inmates had moved garbage cans full of water under the pipes through which the OC spray would have been introduced. This argument is belied by the surveillance video which shows that the inmates only moved the buckets into place *after* Kendrick was already taken from the cell. *See* Ex. A at the 15:07 minute mark. Plaintiffs' expert, Richard Subia, confirmed that the video showed that the cans were only moved *after* Kendrick was taken out of his cell. Ex. Q, p. 95-96.

**Summary Judgment Standard**

MTC set forth the appropriate summary judgment standard in its motion.

**A.     Questions of material fact exist which make summary judgment inappropriate as to the Plaintiffs' negligence and gross negligence claims against MTC**

MTC claims it cannot be held liable under a general "negligence" theory. This is completely wrong. MTC is a private prison and as such, is subject to the "exercising of ordinary care" toward Kendrick Walker. Judge Mills noted that the negligence standard applied to private prisons and stated:

> Defendants have presently moved for partial summary judgment, conceding that plaintiffs have established triable fact issues with regard to their claims of negligence against CCA but arguing that the remaining defendants and claims should be dismissed…. Plaintiffs should consider themselves fortunate, from a litigation

perspective, that they are able to assert negligence claims at all, since the vast majority of state and federal prisoners in this country would be unable to do so. Indeed, the Mississippi Tort Claims Act bars tort claims by inmates against the state and its political subdivisions altogether, see Miss. Code Ann. § 11-46-9(1)(m), and the U.S. Supreme Court has noted that "[f]ederal prisoners in private facilities enjoy a parallel tort remedy that is unavailable to prisoners housed in Government facilities," including the right to assert claims for simple negligence. Correctional Services Corp. v. Malesko, 534 U.S. 61, 72, 122 S.Ct. 515, 151 L. Ed. 2d 456 (U.S. 2001).

*Lonoaea v. Corr. Corp. of Am.,* 665 F. Supp. 2d 677 (N.D. Miss. 2009).

As Judge Mills noted, the United States Supreme Court has recognized that federal prisoners who were housed in private prisons also had a State tort remedy.

"where…a federal prisoner seeks damages from privately employed personnel working at a privately operated federal prison, where the conduct allegedly amounts to a violation of the Eighth Amendment, and where that conduct is of a kind that typically falls within the scope of traditional state tort law (such as the conduct involving improper medical care at issue here), the prisoner must seek a remedy under state tort law.

*Minneci v. Pollard,* 132 S. Ct. 617, 181 L. Ed. 2d 606, 80 U.S.L.W. 4041, 23 Fla. L. Weekly Fed. S 42, 2012 WL 43511 (U.S. 2012).

*See also White v. Wexford Health Sources*, Inc. 2012 WL 2377317 (N.D. Miss. 2012).

Applying Mississippi law, the court held that an inmate was allowed to sue a private health care, who contracted with MDOC to provide health care for the inmates, for state law negligence. *Stephens v. Corr. Servs. Corp*., 428 F. Supp. 2d 580 (E.D. Tex. 2006) ("Plaintiff has alleged that CSC [private prison company] breached this duty by not properly segregating Plaintiff from other violent inmates and because of that breach Plaintiff suffered damages. Defendant's motion to dismiss the negligence cause of action is denied.").

In *Cheek v. Nueces County Tex.*, 2013 U.S. Dist. LEXIS 110039, 2013 WL 4017132 (S.D. Tex. Aug. 5, 2013), the inmate's family sued various state officials and NahpCare, the

private company who had contracted with the county to provide health care. In denying Naphcare's motion to dismiss the district court judge held as follows:

> The Complaint alleges that Salter was a physician's assistant who saw these symptoms and failed to adequately treat them or refer Gregory's problems to a physician. The Complaint alleges that other NaphCare employees were also involved in the errors and omissions that resulted in Gregory's death from his medical condition. Negligence claims under Texas law, unlike constitutional claims, permit respondeat superior liability against NaphCare. The Court finds that the allegations are adequate to state negligence claims against NaphCare and Salter.

*Id.* at 58.

In *Wackenhut Ocrr. Corp. v. De La Rosa*, 305 S.W.3d 594 (Tx. 13th Court of Appeals 2009), an inmate was severely beaten by two (2) other inmates and died. The family filed suit in federal court against the private prison company and only raised state law claims including negligence and spoliation. The jury awarded $47 million, $20 million of which was punitive damages. The jury verdict was affirmed on appeal. *See also Adams v. CCA*, 187 P.2d 1190 (Col. 2008), in which the Colorado Court of Appeals upheld a negligence verdict brought against a private prison company after a riot resulted in numerous injuries; *Scainetti v. U.S. ex rel Fed. Bureau of Prisons*, No. 01-cv-9970, 2002 U.S. Dist. LEXIS 24358, 2002 WL 31844920, at *4 (S.D.N.Y. Dec. 18, 2002) (allowing state law claims against private prison operator arising out of employee's sexual assault of inmates to proceed under "a theory of ordinary negligence.").

MTC did not address any of the negligence and gross negligence allegations raised in the Plaintiffs' complaint thus they are barred from raising them in rebuttal. However, based on a review of the facts, there is no argument that the Plaintiffs have created a genuine issue of material fact as to MTC's negligence and/or gross negligence in handling the events leading up to Kendrick's death. MTC's own expert conceded MTC's many failings during his deposition.

**B. Negligent and or Grossly Negligent Training or Supervision**

Since MTC has admitted that the employees were acting in the course and scope of their employment, and is thus vicariously liable for their employees' actions, the Plaintiffs concede that initially it appears MTC is entitled to summary judgment on this point.  However, a genuine issue of material fact exists as to whether an MTC employee negligently or intentionally opened the cell door which allowed the inmates to kill Kendrick Walker.  As stated earlier, several inmates heard the cell door "pop" or "buzz" which indicated the door was being opened by someone in the tower.  Inmates identified at least two (2) MTC officers who were standing over the operating panel which controlled the cell doors.

Additionally, two (2) of these employees were subsequently fired for bringing in contraband to inmates.  Captain Jamie Brown testified that this was an ongoing problem in the prison, and one which MTC officials were made aware of prior to Kendrick's death.  Ex. H, p. 39-40.

Plaintiffs submit, and MTC concedes, that intentionally opening the cell doors would be outside the scope and course of their employment. Thus, MTC could be liable if a jury determined that they negligently trained and/or supervised these employees.

**C. Respondeat superior claims**

MTC contends that Mississippi does not recognize a distinct cause of action for respondeat superior, citing to a footnote in *Jordan v. Premier Entertainment Biloxi, LLC*, 2014 WL 5773762 (S.D. Miss. Nov. 6, 2014).  MTC also claims that the Plaintiffs never amended their complaint to identify any employees who were negligent, which justifies this claim to be dismissed.  MTC is wrong on both points.  Genuine issues of material fact make summary judgment improper.

"Since the mid-19th century, this Court has recognized the doctrine of respondeat superior which imputes an employee's negligence to the employer. However, for just as long, this Court has limited this vicarious liability to acts of the employee 'performed within the scope of the authority conferred.'" *The General Worth v. Hopkins*, 30 Miss. 703, 1856 WL 3945, *6 (Miss. Err. App 1856). *Commercial Bank v. Hearn*, 923 So. 2d 202 (Miss. 2006). Clearly Mississippi recognizes the doctrine of respondeat superior.

The Plaintiffs do not have to name the employees in the suit if they so choose. Under the doctrine of respondeat superior, the employer and employee are jointly and severally liable for injury caused by the employee's negligence. *Capital Transp. Co. v. McDuff*, 319 So. 2d 658, 661 (Miss. 1975). The practical implication of joint and several liability is that a plaintiff in a respondeat superior action ***may sue either the employer or the employee, or both***. *Id.* (citing *Thomas v. Rounds*, 161 Miss. 713, 718-19, 137 So. 894 (1931)). *See also* Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 4:11 (2001). American Jurisprudence states the general rule as to necessary parties: "[T]he right of an injured party to sue the employer is a direct or primary right because the claim is distinct and separate from the claim against the employee; ***therefore, the employee is not a necessary party to an action against an employer.***" Am. Jur. 2d, Employment Relationship § 400 (2004). In fact, there have been suits based upon respondeat superior in which the negligent employee was never made a party. *See, e.g., Children's Med. Group v. Phillips*, 940 So. 2d 931 (Miss. 2006); *AAA Cooper Transp. Co. v. Parks*, 18 So. 3d 909 (Miss. Ct. App. 2009); *Sykes v. Home Health Care Affiliates,* 125 So. 3d 107 (Miss. Ct. App. 2013).

### D. Constitutional claims

MTC glossed over the Plaintiffs' constitutional claims without much analysis. The Plaintiffs have alleged MTC failed to adequately train and supervise its correctional officers,

failed to adequately staff the prison, failed to control the flow of contraband into the prison, failed to supervise, control, and discipline inmates, failed to maintain security in the prison by allowing inmates out of the cells at unauthorized times, and failed to train its staff on emergency procedures, all of which led and/or contributed to Kendrick's death.

Instead, MTC focused its motion only the reaction of MTC's staff to Kendrick's death and ignored the other claims. By failing to address the Plaintiffs' other constitutional claims, i.e. failure to train, supervise, protect, etc., MTC has waived the argument and conceded that a material issue of fact exists as to those claims. "If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." *Keelan v. Majesco Software, Inc.,* 407 F.3d 332, 339 (5th Cir. 2005). *See also Gilbert v. Outback Steakhouse of Florida, Inc.,* 295 Fed. Appx. 710, 715 (5th Cir. 2008) (arguments not raised in response to defendant's summary judgment motion are waived); *United States v. Scruggs,* 2011 U.S. Dist. LEXIS 51757, 2011 WL 1832769 (N.D. Miss. May 13, 2011)(same). However, to the extent that MTC will attempt to address these issues in rebuttal and out of an abundance of caution, the Plaintiffs will address these other claims as well.

"Municipal liability under § 1983 requires proof of three (3) elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Robinson v. Saucier*, 2011 WL 5444166, at *2 (S.D. Miss. Nov. 9, 2011) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell*, 436 U.S. at 694). In other words, "local governmental entities are subject to § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Gilmore*, 2011 WL 6026121, at *6 (quoting *Monell*, 436 U.S. at 694).

The 5th Circuit has set forth the following standard for the imposition of municipal

liability for violation of the United States Constitution or federal laws:

> A municipality is liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy. Official policy is:
>
> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (en banc), *aff'd per curiam* on reh'g 739 F. 2d 993 (5th Cir. 1984) (*en banc*).

The custom, practice or policy of the governmental entity must actually cause a deprivation of constitutional rights. *See Monell*, 436 U.S. at 690-92; s*ee also Mahoney v. City of Jackson*, 2008 WL 2990906, *5 (S.D. Miss. July 25, 2008). For MTC to incur liability for the acts of its employees, "[a]ctual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Mahoney*, 2008 WL 2990906, at *4 (quoting *Webster*, 735 F. 2d at 841); *see also Cox v. City of Dallas*, 430 F. 3d 734, 748 (5th Cir. 2005). Additionally, the United States Supreme Court has held that the inadequacy **must be blatantly obvious** before policymakers can be held liable for violation of constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (emphasis added). "Inadequacy of . . . training can serve . . . as the basis for municipal liability under § 1983, but only if the failure to train amounts to a deliberate indifference to the rights of individuals who come into contact

with the police." *O'Neal v. City of San Antonio*, 344 Fed. App'x 885, 888 (5th Cir. 2009) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). The 5th Circuit Court of Appeals has repeatedly held that "if the training of police officers meets state standards, there can be no cause of action for a failure to train absent a showing that "this legal minimum of training was inadequate to enable [the officers] to deal with the 'usual and recurring situations' faced by jailers and peace officers." *O'Neal*, 344 Fed. App'x at 888 (quoting *Benavides v. County of Wilson*, 955 F. 2d 968, 973 (5th Cir.1992).

MTC has a duty to provide adequate staffing and supervision. "Confinement in a prison where terror reigns is cruel and unusual punishment. A prisoner has a right to be protected from the constant threat of violence…." *Jones v Diamon*, 636 F. 2d 1364, 1373 (5th Cir. 1981) ("*Jones II*") (internal citations omitted). To provide such protection, prison officials must supervise prisoners by providing adequate numbers of qualified security staff and may not leave prisoner safety to the prisoners themselves. *See Gates v. Collier*, 501 F. 2d 1291, 1309-31 (5th Cir. 1974); *Jones v. Gusman*, 296 F.R.D. 416, 431-33 (E.D. La. 2013) (holding that relief was warranted to address "mutually reinforcing effect" of inadequate classification, staffing, and other security components).

In order to establish liability Plaintiffs must be able to prove that MTC acted (or failed to act) with deliberate indifference. "Under *City of Canton*, 489 U.S. at 389, 109 S. Ct. at 1205, in order to prove the city's deliberate indifference, [a plaintiff] must show that the failure to train reflects a 'deliberate' or 'conscious' choice to endanger constitutional rights." *Snyder v. Trepagnier*, 142 F. 3d 791, 799 (5th Cir. 1998). The 5th Circuit has noted that the plaintiff bears an "extremely heavy burden" in establishing both the municipality's deliberate indifference and a causal link between the alleged custom and the alleged constitutional violation. *Peters v. City of Biloxi*, 57 F. Supp. 2d 366, 376 (S.D. Miss. 1999). "In order to carry this heavy burden, 'the

plaintiff must generally demonstrate at least a pattern of similar violations.'" *Pearson v. City of Louisville*, 2008 WL 4814051, at *3 (N.D. Miss. Nov. 4, 2008) (quoting *Monell*, 436 U.S. at 691). However, the 5th Circuit has recognized the "single incident" could impose 1983 liability in certain situations. The Plaintiffs have the burden to show this Court that the alleged constitutional violation (*i.e.* – inmate-on-inmate violence / delay in medical care) was the "highly predictable consequence of a ***particular*** failure to train." *Estate of Thornton v. Rankin Cnty.*, No. 3:13cv620-DPJ-FKB, 2015 WL 1650237, at *4 (S.D. Miss. Apr. 14, 2015)(quoting *Kitchen v. Dallas Cnty.*, 759 F. 3d 468, 484 (5th Cir. 2014) (emphasis in original).

A collection of cases makes is clear that "a single decision may create municipal liability if that decision were made by a final policymaker responsible for that activity." *Brown v. Bryan County, Oklahoma*, 67 F. 3d 1174, 1183 (5th Cir. 1995) (emphasis in original); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988). When a final policymaker makes the relevant decision, and when that decision is within the sphere of the policymaker's final authority, "the existence of a well-established, officially-adopted policy will not insulate the municipality from liability." *Gonzalez v. Ysleta Independent School District*, 996 F.2d 745, 754 (5th Cir. 1993).

Like municipal corporations, a private prison-management corporation such as MTC is not vicariously liable under a theory of respondeat superior for constitutional violations of its employees. *See Olivas v. CCA*, 215 Fed. Appx. 332, 333 (5th Cir. Jan. 30, 2007) (per curiam). Thus, MTC can be held liable under § 1983 only where "an official policy or custom...causes or is the moving force of the constitutional violation." *Turks v. Wilkinson,* 2010 U.S. Dist. LEXIS 41942, 2010 WL 1740798, at * 3 (citing *Phillips v. CCA*, 2006 U.S. Dist. LEXIS 29462, 2006 WL 1308142, at * 3 (W.D. La. May 9, 2006); *Monell*, 436 U.S. at 694). *Husband v. Corr. Corp. of Am.*, 2010 WL 3724542 (S.D. Miss. Sept. 15, 2010).

The Plaintiffs have alleged numerous "policies and customs" in their complaint which were the moving forces behind Kendrick's death. MTC failed to analyze any of these causes of action and instead focused on the fact that MTC's actions when Kendrick was getting attacked did not amount to "deliberate indifference". A review of the cases and facts demonstrate why MTC's motion must fail.

### 1. Failure to Protect, Failure to Train, Failure to Supervise, Failure to Discipline

The Plaintiffs' constitutional causes of action are essentially MTC's failure to protect inmates, including Kendrick Walker, and MTC's failure to train, supervise, and discipline its correctional officers.

Whether the protection is from oneself, similar to suicide cases, or from other inmates, the standard is similar. In such a case, the Plaintiffs must show that Kendrick was detained "under conditions posing a substantial risk or serious harm and that [MTC] was deliberately indifferent to his need for protection." *Bates v. Amite County*, No. 3:11cv368-DPJ-FKB, 2012 WL 5829123, at * 2 (S.D. Miss. Nov. 16, 2012) (quoting *Neals v. Norwood*, 59 F. 3d 530, 533 (5th Cir. 1995); citing *Edwards v. Johnson*, 209 F. 3d 772, 778 (5th Cir. 2000); *Hare v. City of Corinth*, 74 F. 3d 633, 639 (5th Cir. 1996)). "For an official to act with deliberate indifference, he 'must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference.'" *Bates*, 2012 WL 5829123, at * 2 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). "Before one can be found to be deliberately indifferent, an injury must be obvious to the defendant." *Muslim v. Costello*, 70 F. 3d 117, 117 (7th Cir. 1995) (citing *Anthony v. Dowdle*, 853 F. 2d 741 (9th Cir. 1988). A jail official's liability for an episodic act or omission attaches only if that official had subjective knowledge of a substantial risk of serious harm but acted with

24

deliberate indifference to the knowledge. *Hare*, 74 F. 3d. at 648-650. Where only a municipality has been sued, or a private prison, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *McClure v. Biesenbach*, 355 F. App'x 800, 803 (5th Cir. 2009) (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).

Plaintiffs clearly have a constitutional right to be free from excessive force resulting from inadequate *training* or supervision. *See Baker v. Putnal,* 75 F. 3d 190, 199 (5th Cir. 1996). To establish liability under § 1983 for *failure to train or supervise,* Plaintiffs must show that the supervisor failed to *supervise* or *train* his subordinate, that a causal connection existed between that *failure* and the violation of Plaintiffs' rights, and that such *failure* amounted to deliberate indifference. *See Id.*

In a similar case, *Kesler v. King,* 29 F. Supp. 2d 356 (S.D. Tex. 1998), several inmates sued the county, private prison contractor and employees for injuries suffered during a shakedown. The Plaintiffs offered summary evidence that both the CCRI personnel on hand during the September 18 events and the ERT Team that spearheaded the shakedowns were handicapped by inadequate preparation and supervision. "Moreover, the Court is satisfied that the violent and humiliating events of that evening were substantially and causally related to the lack of *training* and supervision. The crucial issue, then, is whether the *training* and supervisory *failures* of Defendant King amounted to deliberate indifference and rose to the level of unreasonableness necessary to overcome qualified immunity." *Id.* at 367.

The Court went on to find that the supervisor, Defendant King, was liable for failing to train and supervise the employees:

> Defendant King took no steps to provide any *training* for CCRI personnel or even to ensure that they were *trained* prior to the arrival of the first group of CCRI inmates. At his first inkling that

25

CCRI might not be up to the task of settling down a noisy new group of inmates, moreover, Defendant King unhesitatingly authorized the use of the Brazoria County ERT Team. He made this decision, again, without offering any instruction whatsoever on the proper use of the team or the proper coordination of efforts among the team, other Brazoria County personnel, and CCRI officers. The ERT Team, in fact, stood by for hours and ultimately went into action without any instructions as to its objective or the necessities of the situation in the CCRI wing of the detention center. The lack of coordination in the September 18 incident is indicative of a more general *failure* to prepare for situations calling for cooperation between Brazoria County and CCRI personnel; as Defendant King testified in his deposition, he had held no discussion of any type along those lines. In addition, he neither remained present when the ERT Team was deployed nor delegated his chief deputy, Defendant Wagner, to brief or oversee the team. Considering Plaintiffs' summary evidence on the whole, Defendant King's actions amount to deliberate indifference. The Court concludes that no reasonable law enforcement officer in Defendant King's position could have considered such conduct lawful. This *failure* on Defendant King's part is only exacerbated by the fact that he viewed the Missouri inmates housed in the CCRU wing of his jail as a source of revenue for Brazoria County. Accordingly, Defendant King is not entitled to qualified immunity on Plaintiffs' allegation of *failure to train* or *supervise* under § 1983. Moreover, Plaintiffs' summary evidence establishes a genuine issue of material fact with respect to the issue of deliberate indifference. *Id.*

*Kesler v. King,* 29 F. Supp. 2d 356, 367 (S.D. Tex. 1998).

The failure to address the security of the cell doors and staff ineptness can also create a question of fact regarding whether an official acted with deliberate indifference:

[supervisor's] *failure* to address the maintenance problems and the *staff's* ineptness can establish deliberate indifference if he recklessly failed to act. In other words, his choice of one course of action over another will result in liability if he knew of an alternative method that would alleviate the harm and disregarded that opinion.

*Pugh v. Rockwall County,* 2000 WL 730426 (N.D. Tex. May 19, 2000).

In *Pugh,* the district court denied summary judgment on the Plaintiff's failure to train, supervise and protect claims. The Plaintiff was in jail for assaulting a child. The mother of the

child was also in the same jail and had communicated with other inmates and asked them to assault the Plaintiff. The Plaintiff argued that the Sheriff's subjective knowledge of the defects in the security of the jail as well as his own situation (being at risk for assaulting a child) created a fact issue. The Court agreed:

> The acknowledged increased danger along with the known maintenance defects in the jail create a whole set of facts, known to the Sheriff, from which an inference of a substantial risk of harm to Pugh and other inmates like him could have been drawn. Plaintiff has met his summary judgment burden of demonstrating a fact issue as to whether Kiere in fact drew that inference.

*Id.* at 44.

The record is clear that MTC failed to have any correctional officers on duty at the time of the riot who were trained to use the 37-millimeter gun or pepper ball gun, even though their own policies and procedures require this. Ex. M, p. 102; Ex. N; Ex. S, p. 39-40. The deputy warden on duty acknowledged this failure, as did MTC's own expert. *Id.* It is apparent from the actions of the employees that they did not receive any training in how to handle an emergency situation.

MTC's warden and other supervisors were aware of the prior violence at the facility, the fact that prisoners had easy access to weapons such as knives as large as swords, and were aware that the cell doors at the facility were compromised by the inmates. Warden Shaw and other officials were also subjectively aware that Kendrick's life was in danger due to his behavior towards other inmates. MTC was aware of the need to always have staff on duty who were trained to use the 37-millimeter gun and pepper ball gun in order to protect inmates like Kendrick Walker.

MTC officials and employees allowed the inmates to run the prison. Surveillance video taken at night, when inmates are required to be locked in their cells, features inmates coming and

going freely without any MTC employee interrupting. Correctional officers are nowhere to be seen although inmates can be observed coming up to the tower window and chatting amicably with the guards in the tower. Inmates conduct all night board games, use the microwave to heat up food, and generally socialize with one another.

Despite what MTC may contend in rebuttal, fixing the cell door locks was their responsibility. MTC Vice President Marjorie Brown was designated as MTC's corporate spokesperson. Ms. Brown admitted that MTC ultimately had the responsibility for making sure that the cell doors were secured and the inmates were protected from harm. Ex. F, p. 145. Ms. Brown was also candid when expressing concern when viewing the nighttime surveillance video:

> Q: This is May 2nd, 2015, Wilkinson County Correctional Facility, 2:30 a.m. in the morning. Can you just describe what you see on the scene there?
>
> A: Inmates walking around.
>
>    ***
>
> Q: Is there any indication in that video that there are any officers on the floor?
>
> A: No, there's not.
>
> Q: We just saw one inmate go to the microwave and heat something up. Correct?
>
> A: Yes.
>
> Q: You can watch those inmates getting ready to walk up the steps. He's just going to go into his cell, open the door and walk in. You can see other inmates coming and going out of their cells as well. Correct?
>
> A: Yes.
>
> Q: You can see the gentleman that just walked up the steps getting ready to go in his cell. Does there appear to be anybody, any security or any correctional officers, coming out to try and attempt to get these inmates back in their cells?

A: No.

***

Q: Obviously, it's concerning because part of the security of your facility is to have – make sure the cell doors can lock and remain locked at all times. Correct?

A: Well, we don't know that they're not locked. ***I would suspect that the doors they came out of are probably tampered*** –

Q: Sure.

A: ***-- i.e., with a sock or bottle top on it so that the inmates can come in and out as they choose.***

Q: ***And you would agree with me that to have cell phone -- cell doors that can remain locked helps with the security of a prison?***

A: ***Absolutely.***

Q: ***It's integral -- is it integal or integral? -- it's very important to have locking cell doors in a prison. Would you agree with that?***

A: ***It is absolutely important.***

Q: Not only for the safety of the staff but also for the other inmates?

A: Exactly.

Q: Who you have a duty to protect from harm?

A: Yes.

Q: Prior to -- have you ever seen – the surveillance video I just showed you, have you ever seen a surveillance video like that?

A: I have.

Q: Does it concern you not only that they're out, which we've talked about, but that staff is not doing anything to get them back in?

A: And again, I'm just going to be very honest and up front because I do review video. The inmates are just sitting and eating, and that -- they could be doing worse things. But there is an

officer in the control center that also should be calling her supervisor and reporting this and getting them back in their cells.

Q: And it also could be construed that the inmates know that nobody cares that they are out of their cells at 2:30 in the morning.

A: *It could be construed as that. And as casual as they are, it is obvious that that is something that it seems to be the norm.*

Q: Absolutely -- absolutely no concern on the inmates at all that they are going to be in trouble for being out of their cell?

A: They will tomorrow.

Q: Well, this was earlier this year. I think they are in the clear now.

A: After I just reviewed some tape yesterday.

Q: But that's an ongoing problem?

A: Yeah.

***

At one point, Ms. Brown exasperatedly asked a question to opposing counsel:

**A: Did you show the warden this?**

Q: Yes.

A: Okay.

Ex. F, p. 137-142 (emphasis supplied).

Warden Shaw was aware that the cell doors were malfunctioning and the inmates were getting out at night. Ex. K, p. 76-83. Shaw admitted that not only was this a violation of MTC and MDOC policy, but it also constituted a security threat to other inmates and staff. *Id.* at 85. Each employee who was deposed acknowledged the wide spread problem with the cell doors.

MTC officials were aware that Kendrick Walker needed to be moved from the facility for his own protection. Warden Shaw and Major Walker acknowledged this danger. Major Walker specifically testified that "[Kendrick's] going to get himself jumped on, he's going to get beat

up…" Ex. I, p. 69.  Even though Kendrick was in danger of being jumped on, he was not moved to a segregated area of the prison or placed in protective custody.

MTC officials were aware prior to Kendrick's death that inmates were recruiting "local" women to apply for jobs at the prison in order for them to bring in contraband.  MTC officials acknowledged that contraband is dangerous in prison as it creates a security risk.  Two (2) of these gang affiliated female guards were on duty the night Kendrick was killed.  Several inmates indicated that one (1) of them opened the door to the cell in which Kendrick was locked.

MTC knew, or should have known, that the high female to male guard ratio was unsafe. Plaintiffs' prison expert testified that having so many female correctional officers, one hundred (100) out of one hundred ten (110), made it more difficult to conduct pat down searches for weapons and other contraband.  Mr. Subia opined that the inability to search for weapons contributed to Kendrick's death.  MTC's own expert was forced to admit that MTC employed a high percentage of female correctional officers and that the facilities he worked at with similar inmate populations as WCCF would be around twenty-five to thirty percent (25-30%), or closer to thirty-five (35) females instead of one hundred (100).

MTC officials were acutely aware of the fact that fights occurred frequently at the prison. When MTC took over, the prison was on lockdown due to the murder of Demond Flowers which occurred on April 20, 2013.  MTC operates other prisons in Mississippi which have experienced similar fights and riots.  Ex. F, p. 45-47.  The case of *Thomas v. Cumberland County*, 749 F. 3d 217 (3rd Cir. 2014) is analogous to the case before the court and persuasive.

Thomas was an inmate who was attacked by other inmates after an argument that lasted several minutes.  Thomas filed suit and alleged that the prison failed to provide conflict de-escalation and intervention training to its officers.  Thomas also provided expert opinion evidence that the failure to provide conflict de-escalation and intervention training was a careless

and dangerous practice not aligned with prevailing standards. The Court noted that Thomas did not provide a "pattern" of similar incidents. The Court analyzed the case under the "single incident theory of liability". As in the case at bar, Thomas was able to show that the jail had a history of violence which was "relevant to whether his injury was a 'highly predictable consequence' of the failure to train on de-escalation techniques for single-incident liability." *Id.* at 225. Viewing the evidence in the record, including Dr. Kiekbusch's expert opinion, in the light most favorable to Thomas, a reasonable jury could find that the County acted with deliberate indifference. *Id.*

For whatever reason, MTC's officials ignored these known risks at a historically violent prison. The only issue raised in MTC's motion for summary judgement is whether MTC's inaction was deliberate indifference. That issue is decided by case law. "When a [official] continues to turn a blind eye to severe violations of inmates' constitutional rights - despite having received notice of such violations - a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference." *Henry v. County of Shasta*, 132 F. 3d 512, 519, 1997 U.S. App. LEXIS 40444, *23, 97 Cal. Daily Op. Service 9610, 98 Daily Journal DAR 2245 (9th Cir. Cal. 1997).

In *Thomas*,

> the Plaintiff put forward evidence from Santiago — the first inmate who struck Thomas — that the officers could have stopped the argument before violence broke out. He also presented an inmate witness's statement that the officers allowed the inmates to fight. There is ample evidence in the record that [correctional officer] Martinez was present throughout the argument, which lasted for several minutes, before Thomas was struck. Thomas offered expert opinion evidence that the CCCF's lack of de-escalation training, among other things, contributed to the serious injuries that Thomas sustained. Similar expert opinion evidence was offered to preclude summary judgment in *A.M. ex rel. J.M.K.* See 372 F.3d at 582 ("In [the expert's] opinion, the Center's failure to train its staff and follow other recognized standards for the operation of juvenile

detention facilities directly contributed to the inappropriate treatment of A.M. while he was detained."). Presented with this evidence and using their judgment and common sense, a reasonable jury could have concluded that the lack of training in conflict de-escalation and intervention caused Thomas's injuries.

*Id.* at 226-227.

In Kendrick's case, the video evidence shows that Kendrick was locked in a cell for almost twelve (12) minutes. MTC's were all aware that the cell doors could be compromised and knew, or should have known, that Kendrick was still in danger. MTC employees had plenty of time to come to his aid. Despite acknowledging its duty to protect inmates like Kendrick, nothing was done. Had MTC properly staffed and trained its employees on the 37 millimeter gun and ensured that at least one (1) employee was always on duty who was certified to use this weapon, Kendrick would not have been killed. The surveillance video clearly shows that when the MTC officers entered the Pod with the 37-millimeter gun, the inmates immediately complied. Major Walker, Capt. Brown, Warden Shaw, and Deputy Warden Jackson all testified that the inmates normally complied when the 37-millimeter was brought out. None of the employees were trained to use either the 37-millimeter or pepper gun. MTC's own expert opined that it is important to have staff on duty at all times who are trained to use these weapons and MTC failed in this respect. Ex. M, p. 115, 118. Based on his experience, MTC's expert opined that had MTC properly trained its staff to use the weapons, inmates generally would have dispersed. *Id.*

Mr. Subia was more adamant in his opinion that Kendrick's death was "avoidable". Mr. Subia noted that MTC's own emergency policies required them to have someone on duty at all times who was trained to use the pepper ball gun or 37-millimeter. Ex. Q, p. 88-89; Ex. P, p. 5. Mr. Subia opined that had MTC properly trained and staffed that day then Kendrick would not have been killed. Ex. Q, p. 93-96.

### E.  Punitive Damages

The issue of punitive damages is not ripe for consideration.  Punitive damages are appropriate against MTC pursuant to §11-1-65 of the *Mississippi Code Ann*. (1972 as amended). The issue of punitive damages can only be considered after a properly instructed jury awards compensatory damages.  If so, then the trial court must hold a evidentiary hearing to determine whether punitive damages may be considered by the jury.  *Id.  See also Bradfield v. Schwartz*, 2006 WL 1350051 (Miss. 2006) (error for trial court not follow procedure set forth in 11-1-65). Federal courts follow § 11-1-65 when addressing punitive damages as well.  *See generally Grosch v. Tunica Co*. 2009 WL 161856 (N.D. Miss. 2009).  The Court should defer the issue of punitive damages and it should be "carried to trial and decided after the liability phase concludes."  *Ancar v. Brown* (S.D. Miss. Oct. 2, 2013).

Regardless, the Plaintiffs submit that genuine issues of material fact preclude summary judgment on the punitive damage claims.

### CONCLUSION

The Plaintiffs have clearly demonstrated that genuine issues of material fact exist on all claims raised.  MTC's position is so weak that even its own retained expert could not provide support.  MTC's acts constitute negligence, gross negligence and deliberate indifference.  A jury should ultimately decide this case.

RESPECTFULLY SUBMITTED, THIS the 1st day of April, 2016.

JONATHAN LEWIS GRIFFIN, PLAINTIFF


BY:     */s/ Charles R. Mullins*_____
            CHARLES R. MULLINS

OF COUNSEL:

CHARLES R. MULLINS (MB# 9821)
MERRIDA (BUDDY) COXWELL (MB# 7782)
COXWELL & ASSOCIATES, PLLC
Post Office Box 1337
Jackson, Mississippi 39215-1337
Telephone: (601) 948-1600
Facsimile: (601) 948-1600
chuckm@coxwelllaw.com
merridac@coxwelllaw.com
*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I, Charles R. Mullins, attorney of record for the Plaintiff in the above-styled and referenced matter, do hereby certify that I have this date electronically filed the foregoing *Plaintiff's Memorandum Brief in Support of Response to Defendant, Management & Training Corporation's Motion for Summary Judgment* with the Clerk of Court utilizing the ECF System, which sent notice of same to the following:

> R. JARRAD GARNER
> BENJAMIN B. MORGAN
> ADAMS & REESE, LLP
> 1018 Highland Colony Parkway, Suite 800
> Ridgeland, Mississippi 39157
> Jarrad.garner@arlaw.com
> Ben.morgan@arlaw.com

THIS, the 1st day of April, 2016.


/s/ Charles R. Mullins_____
CHARLES R. MULLINS